IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:20-CR-32 (LEK) |
| | ) | |
| v. | ) | **Plea Agreement** |
| | ) | |
| **LUKE E. STEINER,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

U.S. DISTRICT COURT - N.D. OF N.Y.
F I L E D
FEB 0 5 2020
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

The United States of America, by and through its counsel of record, the United States

Attorney for the Northern District of New York, and defendant **LUKE E. STEINER** (hereinafter

"the defendant"), by and through the defendant's counsel of record, hereby enter into the following

plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1) **The Defendant's Obligations:**

   a) **Guilty Plea:** The defendant will waive indictment and plead guilty to Count 1 of the
   information in Case No. 1:20-CR-32 (LEK) charging conspiracy to commit wire fraud, in
   violation of 18 U.S.C. §§ 1349, 1343.

   b) **Special Assessment:**   The defendant will pay an assessment of $100 per count of
   conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or money
   order to the Clerk of the Court in the amount of $100, payable to the U.S. District Court,
   at the time of sentencing.

   c) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely
   manner with all of the terms of this plea agreement.

   d) **Restitution:** The defendant will consent to entry of an order directing the defendant's
   payment of restitution in the following amounts to the following victims, whether or not
   the losses suffered by those victims resulted from the offense of conviction: (1)

$3,062,515.23 payable to Financing Company-1, and (2) $9,905,989.99 payable to Financing Company-2, for total restitution in the amount of $12,968,505.22.

e) **Forfeiture:** Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

(1) A money judgment in the amount of $11,300.

(2) If any of the property described above, as a result of any act or omission of the defendant, either: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) and Fed. R. Crim. P. 32.2(e).

2) <u>**The Government's Obligations:**</u>

a) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No. 1:20-CR-32 (LEK) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

b) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

2

3)      **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty:

a) **Maximum term of imprisonment:** 20 years, pursuant to 18 U.S.C. § 1343.

b) **Maximum fine:** $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

c) **Supervised release term:** The sentencing court may require the defendant to serve a term of supervised release of up to 3 years, to begin after imprisonment.  *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 2 years.

d) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4)      **Elements of Offense:** The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty.  The defendant admits that the defendant's conduct satisfies each and every one of these elements.

(1) *First*, two or more persons conspired to knowingly and willfully participate in a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations, or promises, with knowledge of the scheme's fraudulent nature and specific intent to defraud, and reasonably foreseeing that one or more members of the conspiracy would use or cause to be used the interstate wires in furtherance of the scheme to defraud; and

(2) *Second*, the defendant joined that conspiracy, either at its inception or sometime during its existence, knowing the purpose of the conspiracy and intending to help it succeed.

3

5)   **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

a)   Between 2013 and September 2019, the defendant conspired with Michael T. Mann ("Mann") and others to fraudulently obtain millions of dollars in loans from various financing companies, including Financing Company-1 and Financing Company-2, by assigning false invoices to the financing companies as collateral for loans. The defendant's role in the conspiracy was to falsely represent to the financing companies that the invoices were valid and payable by his employer.

b)   The defendant resided in Minnesota and worked for Optum, a division of UnitedHealth Group Incorporated ("UHG") located in Eden Prairie, Minnesota. Mann resided in the Northern District of New York, and owned and operated ValueWise Corporation ("ValueWise") and other companies based in Clifton Park, New York. A mutual acquaintance of the defendant and Mann, Coconspirator-3 ("CC-3"), worked with the defendant at Optum/UHG until approximately October 2013, when he left Optum/UHG and began working with Mann at ValueWise.

c)   ValueWise performed consulting services for Optum/UHG from at least 2013 to approximately May 2017, when Optum/UHG terminated its relationship with ValueWise.

d)   Mann orchestrated a scheme, which came to include the defendant, to obtain millions of dollars in loans from financing companies under false pretenses. To obtain the loans, Mann falsely represented that his companies other than ValueWise, including FocalPointe Group, LLC ("FocalPointe") and Weitz & Associates, Inc. ("Weitz"), performed consulting work

for and had accounts receivables payable by Optum/UHG.  The companies did not, however, have any accounts receivables payable by Optum/UHG.

e) Mann routinely created false invoices purportedly from his companies, including FocalPointe and Weitz, falsely reflecting millions of dollars in payments purportedly due from Optum/UHG to Mann's companies.  He then assigned the invoices to financing companies, including Financing Company-1, based in New York, and Financing Company-2, based in Colorado.  The financing companies, including Financing Company-1 and Financing Company-2, loaned millions of dollars against the false receivables to Mann and his companies.  Mann then used other fraudulently obtained funds to pay the amounts of the false invoices to the financing companies and made it appear as if payment came from Optum/UHG, when the payments in fact came from Mann.

f) In October 2013, Mann and CC-3 recruited the defendant to participate in the scheme by falsely representing to the financing companies that the false receivables were valid and payable by Optum/UHG.  The defendant, purporting to act in his capacity as an Optum/UHG employee, regularly represented to financing companies that the false invoices submitted by Mann were valid and payable by Optum/UHG, when, as the defendant knew, the invoices were false.

g) The defendant knowingly made these false representations to multiple financing companies, including to Financing Company-1 from October 2013 to August 2019, and to Financing Company-2 from October 2014 to February 2017.  In falsely representing that the fictitious invoices submitted by Mann were valid, the defendant communicated with Financing Company-1 and Financing Company-2 from his work email address at Optum ("Steiner Optum Email"), and the emails were transmitted between two or more states.

5

**Financing Company-1**

h) For instance, on October 28, 2014, a representative of Financing Company-1 ("Representative-1") sent the defendant an email at the Steiner Optum Email and attached an "Invoice Aging Report" reflecting approximately $4.6 million in purported invoices from FocalPointe to Optum/UHG assigned to Financing Company-1.  In the body of the email, Representative-1 wrote, "Would you please confirm, by returning this email, that you show that United Health – Optum has these invoices and shows them as correct and now owing for the account of Focalpoint Group LLC," and "that you show them payable to [Financing Company-1] as assignee."

i) Minutes later, the defendant forwarded the email to Mann and wrote "FYI."  Mann, after asking, "Did you reply?" and explaining, "You can copy and paste what is below if you haven't," wrote: "Yes, United Health - Optum has these invoices and they are correct for the account of Focalpointe Group LLC except for invoices 1151, 1152 and 1153.  You should have received payment today.  These are payable to [Financing Company-1] as assignee."  The defendant, in turn, responded to Representative-1's email and, copying from Mann's email, wrote: "Yes, United Health - Optum has these invoices and they are correct for the account of Focalpointe Group LLC except for invoices 1151, 1152 and 1153.  You should have received payment today."

j) On August 27, 2019, Representative-1 sent the defendant an email at the Steiner Optum Email and attached an "Invoice Aging Report" reflecting approximately $3.6 million in purported invoices from FocalPointe to Optum/UHG assigned to Financing Company-1. In the body of the email, Representative-1 wrote, "Total outstanding and owed to [Financing Company-1] as of today 8/27/2019 $ 3,603,170.85," followed by, "Would you

6

please confirm by returning this email that: (1) You show that United Health - Optum has these invoices listed on the aging and you show them as correct and owing for the account of Focalpointe Group LLC and that (2) You show them payable to [Financing Company-1] as the assignee[.]" A day later, the defendant forwarded the email to Mann and wrote "FYI." Mann responded, "This looks good. Invoices 1680 and 1681 to be paid this week." The defendant, in turn, responded to Representative-1's email and wrote: "This looks good and payment should be coming on 1680 and 1681."

k) The defendant's representations to Representative-1 were false because, as he knew at the time of his emails, Optum/UHG had no invoices from FocalPointe and never made payments to FocalPointe.

l) The defendant and Mann also routinely exchanged text messages concerning the defendant responding to Representative-1's emails and falsely representing that invoices submitted by Mann to Financing Company-1 were valid and payable by Optum/UHG. These text messages were transmitted between two or more states.

m) For instance, on March 2, 2017, Mann sent the defendant a text message stating, "Luke.... I am having trouble opening the email. It does look good and invoices 1420 and 1421 will be paid this week. I looked at it before I was out of pocket. I can only view on my phone," followed by, "Was this text good enough so you could respond?" After the defendant answered, "Yes but haven't yet," Mann explained, "No problem. I know you are busy. I do appreciate your help," and the defendant replied, "I will respond shortly."

n) Earlier in the day, and prior to Mann's first text message to the defendant, Representative-1 sent the defendant an email at the Steiner Optum Email and attached an "Invoice Aging Report" reflecting approximately $3.7 million in purported invoices from FocalPointe to

7

Optum/UHG assigned to Financing Company-1, including invoice numbers "1420" and "1421" for $236,680.81 and $215,473.33, respectively. In the body of the email, Representative-1 wrote: "Total outstanding and owed to [Financing Company-1] as of today 3/2/2017 $ 3,729,674.74," followed by, "Would you please confirm by returning this email that: (1) You show that United Health – Optum has these invoices listed on the aging and you show them as correct and owing for the account of Focalpointe Group LLC and that (2) You show them payable to [Financing Company-1] as the assignee." Later in the day, and after his final text message to Mann, the defendant responded to Representative-1 and wrote: "Looks good, payment should be coming on 1420 and 1421."

o) In his initial text message to the defendant, Mann referenced Representative-1's email; explained that invoices 1420 and 1421, as reflected in the "Invoice Aging Report," would be paid that week; and inquired into whether the defendant had sufficient information to respond to Representative-1. The defendant answered in the affirmative and explained that he would respond to Representative-1's email shortly. In responding, "Looks good, payment should be coming on 1420 and 1421," to Representative-1's email, the defendant falsely represented that Optum/UHG received and would pay the approximately $3.7 million in invoices from FocalPointe and that the invoices were payable to Financing Company-1. As the defendant knew at the time of his email, Optum/UGH never had a contract with FocalPointe; never received invoices from FocalPointe; and never made any payments to FocalPointe.

**Financing Company-2**

p) On November 4, 2016, Mann sent the defendant an email at the Steiner Optum Email, copied a representative of Financing Company-2, and attached three (3) false invoices

8

purportedly from Weitz to Optum/UHG for a total of approximately $370,000.  In the body of the email, Mann wrote: "Enclosed are the invoices from last week and they match to your system's consolidated invoices.  I have them as detail attached.  Can you verify that you have received this by replying to all in this email?"  Later in the day, the defendant responded to Mann, copying the representative of Financing Company-2, and wrote: "I have received these."

q)   On January 30, 2017, Mann sent the defendant an email at the Steiner Optum Email, copied a representative of Financing Company-2, and attached three (3) false invoices purportedly from Weitz to Optum/UHG for a total of approximately $714,000.  In the body of the email, Mann wrote: "Enclosed are the invoices from this week and they match to your system's consolidated invoices.  I have them as detail attached.  Can you verify that you have received this by replying to all in this email?"  Later in the day, the defendant responded to Mann, copying the representative of Financing Company-2, and wrote: "Thanks Mike."

r)   The defendant's representations to Financing Company-2 were false because, as he knew at the time of his emails, Optum/UHG had no invoices from Weitz and owed no money to Weitz.

s)   The defendant and Mann also exchanged text messages regarding the false invoices that Mann had submitted to Financing Company-2.  These text messages were transmitted between two or more states.

t)   For instance, on April 9, 2015, Mann sent the defendant an email at the Steiner Optum Email, copied a representative of Financing Company-2, and attached three (3) false invoices purportedly from Weitz to Optum/UHG for a total of approximately $500,000.  In the body of the email, Mann wrote: "Enclosed are the invoices from this week and they

9

match to your system's consolidated invoices. I have them as detail attached. Can you verify that you have received this by replying to all in this email?"

u) Minutes after sending the email, Mann sent the defendant a text message stating, "I just sent you the email for [Financing Company-2]. When you get a chance, just reply to all. You can ignore [Representative-1's] email this week. I hope you are having a great vacation," to which the defendant responded, "Thanks, will do in about an hour."

v) Later in the day, the defendant responded to Mann's email, copying the representative from Financing Company-2, and wrote: "Hi Mike, This looks good. Thanks."

w) In his text message, Mann advised the defendant that he sent the email with the false invoices to the defendant and asked the defendant to respond to the email copying the representative of Financing Company-2. The defendant agreed to do so, and then responded to Mann's email. In responding to Mann's email and copying the representative of Financing Company-2, the defendant falsely represented that Optum/UHG received the three false invoices from Weitz and would pay the invoices. As the defendant knew at the time of his email, Optum/UGH never had a contract with Weitz; never received invoices from Weitz; and never made any payments to Weitz.

**Loss and forfeiture amounts**

x) The defendant's participation in the scheme resulted in $3,062,515.23 in losses to Financing Company-1 and $9,905,989.99 in losses to Financing Company-2.

y) Between December 2017 and August 2019, Mann periodically sent the defendant Amazon gift cards in return for his participation in the fraud scheme. The defendant personally received a total of $11,300 in gift cards from Mann.

6)   **Sentencing Stipulations:**

a)   The parties agree that the Base Offense Level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).

b)   The parties agree that the offense of conviction involved, and that the defendant is personally accountable for, a reasonably foreseeable loss amount of $3,062,515.23, resulting in a 16-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(I).

c)   The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

d)   The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. § 3E1.1(a).

7)      <u>**Waiver of Rights to Appeal and Collateral Attack:**</u> The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

a)   The conviction resulting from the defendant's guilty plea;

b)   Any claim that the statutes to which the defendant is pleading guilty are unconstitutional;

c)   Any claim that the admitted conduct does not fall within the scope of the statute;

d)   Any sentence to a term of imprisonment of 71 months or less;

e)   Any sentence to a fine within the maximum permitted by law;

f)   Any sentence to a term of supervised release within the maximum permitted by law;

g)   Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

A. **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right.   Defense counsel has advised the defendant of the nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination.  The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.  The Court is neither a party to, nor bound by this Plea Agreement.  The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office.  If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the

13

federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties.  If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

**E.** **Sentencing:**

a. **Maximum terms of imprisonment:**  The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement.  If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other.  Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

b. **Mandatory minimum terms of imprisonment:**  If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment.  In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies.  Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements**: The defendant understands that if the government has filed an information against the defendant as provided by 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that the defendant was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

    i. The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

    ii. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

    iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level

different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the

16

Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:**   Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

h. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. § 1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

i. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more

17

supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

a. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b. If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. If the defendant is a naturalized citizen, such conviction may result in denaturalization, followed by deportation or removal from the United States. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

c.  A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G.  **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

a.   The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

b.   The defendant consents to the entry of an order of forfeiture of the assets described above.

c.   The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents.  The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court.  The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d.   Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture.  Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e.   In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets

20

transferred to any such third party.  The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f.  The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g.  The defendant waives the right to a jury trial on the forfeiture of assets.  The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h.  The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

i.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property.  The defendant shall not

reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

I.  **Determination of Financial Condition and Payment of Interest and Penalties:**

    a.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

    b.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

    c.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

    d.  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

J.  **Remedies for Breach:**

    a.  Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part.  In the event of such breach, the defendant will

remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b. If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

   i. To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

   ii. In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

   iii. To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. § 1B1.8;

   iv. To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

    v.   To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

    vi.  To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

    vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K.  **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant.  References to "the government" in this agreement refer only to that Office.  This agreement does not bind any other federal, state, or local prosecuting authorities.  Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L.  **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

GRANT C. JAQUITH
United States Attorney

_____          2-5-20
Michael Barnett and Cyrus P.W. Rieck        _____
Assistant United States Attorneys            Date
Bar Roll Nos. 519140 and 518933


_____          2-5-20
LUKE E. STEINER                              _____
Defendant                                    Date


_____          2-5-20
James C. Knox, Esq.                          _____
Attorney for Defendant                       Date
Bar Roll No. 517109